CITIZENS FOR MASS TRANSIT,
INC. et al.

v.

Brock ADAMS et al.

and

CONCERNED CITIZENS OF
ALGIERS, INC.

v.

Brock ADAMS et al.

Civ. A. Nos. 79–1767, 80–1586.

United States District Court,
E. D. Louisiana,
New Orleans Division.

June 13, 1980.

Luke Fontana, Peter D. Derbes, New Orleans, La., for plaintiffs.

Carmack M. Blackmon, Baton Rouge, La., Louis B. Porterie, Hattie M. Broussard, New Orleans, La., Patricia N. Young, Dept. of Justice, Washington, D. C., Steve Crawford, New Orleans, La., for defendant.

## OPINION

BEER, District Judge.

Initially, this matter (No. 79–1767) comes before the court by way of defendants' motions for summary judgment. Also set for hearing and adjudication are the preliminary injunctions sought to halt the construction. A similar environmental suit by Concerned Citizens of Algiers, Inc. (No. 80–1586) was transferred to this section so that consistent adjudicative relief could be granted simultaneously. The defendants in No. 80–1586 also seek summary judgment. Likewise, Concerned Citizens of Algiers, Inc. seeks a preliminary injunction against construction of the proposed bridge, incorporating all pleadings filed by plaintiffs in No. 79–1767.

Defendants in both suits also sought an order limiting judicial review to the administrative record, which was directly addressed at the pretrial conference on May 27, 1980. It was essentially understood that the June 5, 1980 hearing would be limited to the administrative record and any affidavits (and/or depositions) filed into the record before that date. All counsel agreed this procedure would be followed, reserving the right to file a responsive memo or affidavit to any affidavits filed very close to the June 5, 1980 hearing date.

Citizens for Mass Transit, Inc. (hereinafter "CMT") and Save Our Wetlands, Inc. (hereinafter "SOWL") seek to halt construction of the bridge, contending that the Coast Guard bridge permit was issued in violation of that agency's regulations governing the review, analysis and recommendation of applications for such permits. Their basic complaints allege central business district (hereinafter "CBD") traffic congestion, air pollution, energy waste and

poor treatment of the no-build alternative. They attach affidavits of members of their organizations and of others whose environmental concerns are supported by good credentials.

Defendants point out that the bridge permit was signed by Rear Admiral W. W. Barrow by direction for Admiral Hayes, the Commandant of the U. S. Coast Guard. Plaintiffs insist that the bridge permit must be signed by the Commandant himself. 33 CFR § 115.60(e)(1).

■ However, the Secretary of Transportation has "delegated to the Commandant, U. S. Coast Guard, *with the authority to redelegate within the Coast Guard*, the authority to exercise the functions, powers and duties of the Secretary." (Emphasis added.) 33 CFR § 114.01(c)(5). Thus, in his capacity as Chief, Office of Marine Environment and Systems, Rear Admiral Barrow properly signed and issued the bridge permit on September 28, 1978. Congress has given the Commandant broad powers to direct all operations of the Coast Guard. 14 U.S.C. § 632. The Commandant's policy as to the redelegation of his authority is set out in the Coast Guard Organization Manual. It is clear that the Commandant has given Admiral Barrow the authority to sign the bridge permit.

■ Plaintiffs also maintain that Admiral Barrow was the Commander of the 8th Coast Guard District when early hearings were conducted on the bridge. On July 12, 1978, Admiral Barrow was named Chief of the Office of Marine Environment and Systems. Thus, claim plaintiffs, he was, thereby, supervising his own earlier recommendation regarding the Downstream Parallel Bridge. This, they contend, constitutes a conflict of interest which renders the issuance of the permit unlawful.

However, defendants' memo points out that:

"First, the issuance of a bridge permit is a purely ministerial function, no less, no more. Upon a finding that the bridge is elevated to a degree to permit unobstructed clearance by vessels and that it

poses no hazards to marine safety and provides for the reasonable needs of the environment, a permit may be issued. Second, the preparation of the environmental impact statement itself shows analysis and judgment as to the propriety of the project. Further, plaintiffs have produced no evidence, through documents or otherwise to show review of this project was limited to Rear Admiral Barrow. The sequence of events, as related by plaintiffs in their memorandum, show an 18-month break between the 1977 date of Rear Admiral Barrow's (then Eighth District Commander) recommendation the permit be issued and July 12, 1978, the date he became Chief, Office of Marine Environment and Systems. Even then, the permit was not finally issued until more than two months after the Admiral assumed his new command. A review of Coast Guard correspondence drawn from the administrative record indicates that the project was reviewed extensively by other offices and divisions of the Coast Guard as well as the Department of Transportation. Review of this correspondence will also show that the 'high-level involvement' of Admiral Barrow was minimal." (Federal Defendants' Exhibits 2–11.)

Plaintiffs further allege that the Final Environmental Impact Statement (hereinafter "FEIS") is deficient in that it fails to present a balanced traffic picture on CBD congestion; fails to adequately set forth air quality data, including smog and carbon monoxide; fails to address the issue of the project's relationship to long-term energy consumption; and fails to consider a rational "no-build" alternative.

■ However, contentions of deficiencies do not, standing alone, establish inadequacy of the FEIS. The real issues which are determinative of the sufficiency of an Environmental Impact Statement (hereinafter "EIS") are: 1) whether the EIS sets forth sufficient information to enable the decision-maker to consider fully the environmental factors invoked and to make a reasoned decision after balancing the risks of

harm to the environment against the benefits to be derived from the proposed action as well as to make a reasoned choice between alternatives; and 2) whether factual or empirical data exists which should have been brought to the attention of the decision-maker. *Sierra Club v. Morton,* 510 F.2d 813 (5th Cir., 1975).

As defendants point out, the primary purpose of the project is to alleviate conditions on the existing Greater New Orleans Bridge. The project is not designed to have significant impact upon traffic outside the project corridor. Plaintiffs are doing little more than drawing their own conclusions as to the impact of the new bridge on traffic in non-project areas.

■ As to the air quality complaints, the Environmental Protection Agency (hereinafter "EPA") has approved the air quality analysis and found that the project meets the National Ambient Air Quality Standard for ozone. (Federal Defendants' Exhibit 14.) Thus, the methods of analysis utilized followed existing EPA standards to the extent such standards have been formally promulgated. (Federal Defendants' Exhibit 13.) Finally, conflicting points of scientific opinion do not give rise to substantial issues of material fact where the sufficiency of an EIS is at issue. Compliance with the National Environmental Policy Act of 1969 (hereinafter "NEPA") is based upon good faith objectivity rather than subjective impartiality. *Mid-Shiawassee County Concerned Citizens v. Train,* 408 F.Supp. 650 (E.D.Mich., 1976).

■ As to the no-build alternative, *Farmland Preservation Association v. Goldschmidt,* 611 F.2d 233 (8th Cir., 1979), stated: "The adoption of the (no-build) alternative would simply have left things as they were . . . highway *traffic would have to continue to use roundabout existing routes.*" (Emphasis ours.) That is exactly what the state and federal agencies here involved are attempting to alleviate.

In seeking injunctive relief, plaintiffs must establish:

(1) a substantial likelihood that the movant will prevail on the merits;

(2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted;

(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and

(4) that the injunction, if issued, would not be adverse to the public interest.

*State of Texas v. Seatrain International, S. A.,* 518 F.2d 175, 179 (5th Cir., 1975); *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir., 1974).

CMT's alleged injuries are: 1) continued and increased emotional and physical stress suffered by present and future users of cross-river mass transit; 2) continued and increased losses of time and money due to increased traffic loads and delays on all bridge crossings; 3) continued and increased emotional and physical stress inflicted upon the operators of private vehicles making cross-river trips; 4) the sacrifice of CMT's members' interest in efficient resources generally; and 5) displacement of those CMT members who work or live along the project corridor.

Thus, CMT and SOWL have alleged that the implementation of the proposed project will irreparably injure and harm their members. SOWL's alleged injuries are the eventual harmful development and concurrent destruction of the remaining wilderness in the New Orleans area as a result of uncontrolled urban expansion generated by the project.

Defendants maintain that there is no danger of immediate and irreparable harm. The injuries for which plaintiffs seek relief are no more than a continuation of existing conditions. Despite the existing disincentives to vehicle use, bridge traffic increases at a constant and high rate. The traffic problems, air and noise pollution, inadequate transit systems, of which CMT complains, *exist now.*

As for a balancing of equities, there is no doubt that a mechanism is required to alleviate the traffic volume, congestion, travel delays and other negative impacts which

currently exist. As the Second Circuit stated in *Hanly v. Kleindienst*, 471 F.2d 823 (2nd Cir., 1972):

"Absent some showing that an entire neighborhood is in the process of redevelopment, its existing environment, though frequently below an ideal standard, represents a norm that cannot be ignored. For instance, one more highway in an area honeycombed with roads usually has less of an adverse impact than if it were constructed through a roadless park."

Defendants also maintain that plaintiffs cannot prevail on the merits, since they have not demonstrated that alternatives exist which were not considered or that the defendants' consideration of the proposal does not comply with the requirements of NEPA.

Finally, the court must consider whether the nature of the rights conferred to the public by NEPA justify the grant of injunctive relief. The major benefit of an injunction would be to preserve for the relevant decision-maker the full opportunity to choose among alternatives that is contemplated by NEPA. In the instant case, all major alternatives have been considered. To return the decision to the agency for reconsideration without new data or significant additional matters would be unnecessary and unwarranted.

Cross-river traffic demand is served by the present Greater New Orleans Bridge, the Huey P. Long Bridge and ferries. The number of trips on the Greater New Orleans Bridge has increased so that the design capacity level (60,000 to 65,000 cars per day) was reached about ten years ago. The Greater New Orleans Bridge has the highest vehicle-per-lane traffic ratio in the United States for major bridges. Largely due to this traffic congestion in excess of design capacity, fatality and accident rates are from two to five times higher than the national averages for limited access roadways and major bridges.

In June, 1973, the United States Mass Transportation Administration initiated various studies for a master transportation plan for the four-parish region of Jefferson, Orleans, St. Bernard and St. Tammany. The final product resulted in the New Orleans Metropolitan Area Transportation Study. Several other reports were published and several public hearings held to debate the four basic alternatives for a new river crossing. The four major alternates were: a Downstream Parallel Bridge, a Press Street Bridge, modification of the existing Greater New Orleans Bridge, and a No-Build Alternate.

As a result of the public participation process, the Advisory Council on Historic Preservation, the Coast Guard, the Louisiana Department of Transportation and Development and the Mississippi River Bridge Authority joined in with the New Orleans City Council and Mayor of New Orleans to affirm and recommend a Downstream Parallel Bridge (Greater New Orleans Bridge No. 2) as the best alternative. December 10, 1977, Memorandum of Agreement, see Exhibits 8.2 and 8.3, Vol. III, FEIS.

The parishes of Orleans, Jefferson, Plaquemines and St. Bernard and the City of New Orleans specifically approved the Greater New Orleans Bridge No. 2. See FEIS, Vol. 4 of 4.

The purpose of the additional bridge is to relieve congestion, reduce time delays, provide for future traffic growth, and interface with existing and future transit facilities. This location is in the corridor with the greatest present and projected demand for cross-river transportation service.

The new bridge will carry four vehicular lanes and two exclusive mass transit lanes, including one-way service for east-bound traffic on the four vehicular lanes and two-way service on the two mass-transit lanes. The existing Greater New Orleans Bridge will provide four lanes of vehicular service for westbank-bound traffic. It includes an exclusive eastbank truck entrance ramp from St. Peter Street.

Following review and study based upon public comments received, the Coast Guard released its Final Environmental Impact Statement on August 16, 1978. The FEIS fully addresses all the direct and primary

impacts of the project. It identifies many secondary impacts, although discussion of these impacts is less extensive. The final statement discusses the impact on historic properties, transportation system impacts, air and noise quality impacts and natural environmental impacts and socio-economic impacts. The statement includes nine alternatives to the proposed action. Some of the alternatives address suggestions made at the public hearings or in letters of comment.

At the end of the final review period, the Coast Guard issued a permit for the construction of the new bridge on September 28, 1978. Plaintiffs brought this action to enjoin the issuance of the permit on the grounds the decision of Admiral Hayes was arbitrary and capricious and that the final environmental statement was inadequate.

█ This case arises under the General Bridge Act of 1946, 60 Stat. 847, 33 U.S.C. § 525, et seq. The Coast Guard is the designated agency under the act to supervise bridge construction. As an expert agency, the Coast Guard, in assessing obstructions on navigation and interpreting its own regulations, is entitled to considerable deference. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

The first issue raised by this motion is whether summary judgment is the appropriate vehicle for dealing with plaintiffs' petition. Defendants maintain that the motion for summary judgment is proper for ruling on the appropriateness of administrative actions. *Manufacturing Chemist Ass'n. v. Castle*, 455 F.Supp. 968 (W.D.La., 1978). *Doraiswamy v. Secretary of Labor*, 555 F.2d 832 (D.C.Cir., 1976). In *Doraiswamy*, the U. S. District Court held that in cases where Congress has simply provided for review, without setting forth standards to be used or procedures to be followed, consideration is to be confined to administrative record and no de novo proceeding may be held, except when action is adjudicatory in nature and agency fact-finding procedures are inadequate or when issues that were not before the agency are raised in proceedings to enforce non-adjudicatory agency action.

The court went on to set out the standard for review as follows:

"The administrative function is statutorily committed to the agency, not the judiciary. A reviewing court is not to supplant the agency on the administrative aspects of the litigation. Rather, the judicial function is fundamentally—and exclusively—an inquiry into the legality and reasonableness of the agency's action, matters to be determined solely on the basis upon which the action was administratively projected."

The scope of this court's judicial review is mandated by 5 U.S.C. § 706:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) * * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) * * *

(C) * * *

(D) without observance of procedure required by law."

Plaintiffs' challenge to the Coast Guard issuance of the permit for this project is based primarily on 42 U.S.C. § 4332, as follows:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\*　　\*　　\*　　\*　　\*　　\*

(C) include in every recommendation or report on proposals for legislation or other major Federal actions significantly affecting the quality of the human environ-

ment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

\* \* \* \* \* \*

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the world-wide and long-range character of environmental problems and, where consistent . . ., lend . . . support to initiatives, resolutions and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment."

■ However, the court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1974). That is, the court's concern must be with whether the agency's factual determinations are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In other words, an agency decision that has a rational basis in the administrative record should be upheld.

The Court of Appeals for the District of Columbia has concluded that in the context of arbitrary and capricious review, a court shall reverse only upon a clear error of judgment if the error is so clear as to deprive the agency's decision of a rational basis. *Ethyl Corp. v. EPA,* 541 F.2d 1 (D.C. Cir., 1976). The court went on to say that the reviewing court must assure itself that

the agency decision was based on a consideration of the relevant factors.

Plaintiffs maintain that defendants cannot carry their burden of proof in this motion for summary judgment. They allege that the following issues are not resolved:

1. The FEIS's failure to mention three independent studies (and its selective editing of a fourth) which expressed responsible opposing views on the project's effect on CBD traffic congestion (a legally cognizable NEPA impact). (A CONCLUSIVE SHOWING OF BAD FAITH)

2. The FEIS's use of partial CBD traffic *volume* data, with no accompanying CBD street *capacity* data, which made assessment of the project's impact on CBD traffic congestion impossible. (A CONCLUSIVE SHOWING OF THE FEIS'S FACIAL INADEQUACY)

3. The FEIS's use of older (favorable) Health Department oxidant (smog) data in lieu of the Coast Guard's own smog data—data which was obtained at a time when the area was conclusively (according to EPA) in violation of the primary smog standard. (A CONCLUSIVE SHOWING OF BAD FAITH)

4. The FEIS's discounting of two rational "No Build" alternatives by means of patent distortion and crucial omission in its analysis of certain essential elements of those two alternatives. (A CONCLUSIVE SHOWING OF BAD FAITH)

5. The FEIS's failure to include any discussion of the effects of automobile pollutants on human beings (apart from a brief discussion of the effects of carbon monoxide contained in the uncirculated technical memorandum). (A CONCLUSIVE SHOWING OF THE FEIS'S FACIAL INADEQUACY)

In *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368 (2nd Cir., 1977), the court outlined a standard for judging the adequacy of an EIS:

"In making such a determination a court is governed by the 'rule of reason,' under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action, but will be upheld as adequate if it has been com-

plied in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action as well as to make a reasoned choice between alternatives."

■ The fact issues raised by plaintiffs assert that competing scientific data should have been given greater weight.

The holding of the *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783 (D.C.Cir., 1971), is pertinent:

"When, as here, the issue of procedure relates to the sufficiency of the presentation in the statement, the court is not to rule on the relative merits of competing scientific opinion. Its function is only to assure that the statement sets forth the opposing scientific views, and does not take the arbitrary and impermissible approach of completely omitting from the statement, and hence from the focus that the statement was intended to provide for the deciding officials, any reference whatever to the existence of responsible scientific opinions concerning possible adverse environmental effects. Only *responsible* opposing views need be included and hence there is room for discretion on the part of the officials preparing the statement; but there is no room for an assumption that their determination is conclusive. The agency need not set forth at full length views with which it disagrees, all that is required is a meaningful reference that identifies the problem at hand for the responsible official. The agency, of course, is not foreclosed from noting in the statement that it accepts certain contentions or rejects others."

■ As to plaintiffs' contention that the "no build" alternative was not adequately assessed, the FEIS shows otherwise. The alternatives discussed, including no-build, provide a schedule of transportation impacts, environmental impacts, air and noise quality impacts and a summary of the dif-ferences between present conditions and projected future conditions under each alternate. As a result of its analyses of all of the alternates, the Coast Guard has concluded that only the downstream parallel span 1) provides sufficient cross-river traffic service to meet the requirements of the Regional Transportation Plan for the design year; and 2) meets the projected demands for Central Business District traffic, through traffic, or both. Also, the preferred alternate provides the greatest flexibility for the development of alternative transportation modes, including mass transit. As stated above, NEPA's requirement that an agency discuss alternatives of the proposed action is subject to a "rule of reason." *County of Suffolk*, supra. It appears, based on the FEIS, that the federal defendants met the requirements of NEPA § 102(2) in their consideration of alternatives.

Plaintiffs also complain about the FEIS's use of partial CBD traffic data. However, plaintiffs offer little indication that the CBD, including the lower-and-middle sections, will be adversely affected.

■ It is sufficient that the FEIS refers to conflicting studies and puts the decision-maker on notice of their existence. The agency need not set forth at full length, the views with which it disagrees, all that is required is a meaningful reference that identifies the problem at hand for the responsible official. *Committee for Nuclear Responsibility, Inc.*, supra.

Finally, as to air quality, plaintiffs are unable to meaningfully contend that the conclusions reached in the FEIS are incorrect. Plaintiffs merely aver the data is old. However, defendants maintain that they utilized the Air Technical Memorandum, published November, 1976, which was the pertinent time in question. Although plaintiffs proffered Drs. Mason and Dimitriades as experts, their opinions that the air quality analysis is insufficient are not the type of conflicting scientific opinion which has caused excessive concern, and conflicting points of scientific opinion do not necessarily give rise to substantial issues of material

**312**

fact. *Mid-Shiawassee County Concerned Citizens,* supra.

Plaintiffs also generally allege that automobile pollutants were not discussed in the FEIS. Federal defendants submit that this is addressed in the technical memorandum at AQ–4. Furthermore, such general allegations give the court little help in determining essential compliance insofar as the FEIS is concerned.

All parties have had an opportunity to make their record in accordance with the pretrial order.[1] The record, as it now stands, is complete for the granting of summary judgment relief.

Defendants maintain that the U. S. Coast Guard Commandant's decision to issue the bridge permit was not arbitrary or capricious, and conformed with the NEPA (42 U.S.C. § 4321 et seq.) and the guidelines of the President's Council on Environmental Quality (40 CFR § 1500 et seq.).

 Where there is more than one solution possible to an administrative problem, the agency decision must be upheld as long as it has a rational basis. *Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Such a basis clearly exists in this case. The Coast Guard rea-

sonably concluded, based on all the evidence before it, that the Greater New Orleans Bridge No. 2 provides the best alternative for new cross-river transit.

The Coast Guard FEIS clearly, adequately and in good faith sets forth the project's environmental consequences to the New Orleans metropolitan region and formed the essential basis for the Coast Guard's consideration on whether the project bridge permit should be issued.

The defendants' motion for summary judgment specifically addressed and factually rebutted plaintiffs' complaint allegations.

In summary, the FEIS demonstrates that there has been no clear error of judgment on the part of the Coast Guard, and that the Coast Guard was not arbitrary and/or capricious in the issuance of the bridge permit.

Although this inquiry must be carefully and thoughtfully considered, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* supra.[2]

---

1. In NEPA cases, a primary function of the court is to insure that the information available includes an adequate discussion of environmental effects and alternatives. Therefore, if there are allegations that an EIS has neglected to mention a serious environmental consequence or failed to adequately discuss a reasonable alternative, the district court may permit the introduction of new evidence, including expert testimony with respect to technical matters. *County of Suffolk,* supra, at p. 1384.

2. I feel obliged to make certain parenthetical observations:

As a member (and, later, acting president) of the New Orleans City Council from 1970 to the end of 1974, I represented the sole councilmanic district (of the city's five districts) that not only encompassed neighborhoods on both sides of the river but included neighborhoods that were heavily involved as potential bridge sites. Because of this, I became very much aware of what can best be described as "bridge politics" —not only from the standpoint of my councilmanic district but also from the standpoint of the city as a whole, as well as with respect to

the city's political, economic and quid pro quo relationship with adjacent Jefferson Parish.

From this awareness, it became apparent to me then (and is still apparent now) that, ultimately, the final bridge location would, surely, be selected as a result of a continuing series of compromises.

That the location is based upon compromises of various vigorously urged contentions is manifest. It is, clearly, not the "best" location nor is it the "worst." Yet, even that categorization depends on a huge number of variables.

What it is—and what is all important to these lawsuits—is a *valid* location—one that is supported by the record as neither whimsical nor arbitrary nor capricious nor arrived at without the requisite due process input that such a project clearly demands.

At times, I dare to wish that we could live more gently on the earth—making do without major changes that may not be real progress when all is said and done. But such philosophical musings are not for these proceedings. We deal here with definitive matter that has a right to definitive resolution.

Accordingly, I will grant defendants' motions for summary judgment and dismiss plaintiffs' complaints. Implicit in this is a denial of the preliminary injunctions sought by plaintiffs.

It is so ordered.