630 F.2d 309
 15 ERC 1337
 CITIZENS FOR MASS TRANSIT, INC. and Save Our Wetlands, Inc.
(SOWL), Plaintiffs- Appellants,
v.
Brock ADAMS, in his official capacity as Secretary of
Transportation, et al., Defendants-Appellees.
CONCERNED CITIZENS OF ALGIERS, INC., Plaintiffs-Appellants,
v.
Brock ADAMS, in his official capacity as Secretary of
Transportation, et al., Defendants-Appellees.
 No. 80-3492.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 Nov. 10, 1980.
 Peter D. Derbes, Luke J. Fontana, New Orleans, La., for plaintiffs-appellants.
 Kathryn A. Oberly, Land & Natural Resources Div., Arthur E. Gowran, Dept. of Justice, Washington, D.C., for Brock, et al.
 Louis B. Porterie, New Orleans, La., Philip K. Jones and Sharon Lyles, James B. Frederick, Jr., Baton Rouge, La., for State of Louisiana, et al.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, AINSWORTH and GEE, Circuit Judges.
 AINSWORTH, Circuit Judge:
 
 
 1
 The issue on this appeal is the adequacy of a final environmental impact statement (FEIS) filed pursuant to the National Environmental Policy Act (NEPA).[1] Plaintiffs, Citizens for Mass Transit, Inc. (CMT), Save Our Wetlands, Inc. (SOWL), and Concerned Citizens of Algiers, Inc. (CCA) (collectively, the Citizens Groups), challenge the district court's determination that the FEIS filed by defendant United States Coast Guard[2] in connection with the construction of the New Orleans Downstream Parallel Bridge satisfied the requirements of NEPA. We find that, in issuing the FEIS, the Coast Guard followed proper procedure and did not act in an arbitrary or capricious manner;[3] accordingly, we affirm the decision of the district court, 492 F.Supp. 304.
 
 
 2
 In 1964, planners in the New Orleans metropolitan area began to investigate the need and proper location for a new bridge across the Mississippi River.[4] FEIS, vol. I, p. 1-4. From 1971 to 1975, several formal studies assessed various plans to alleviate the worsening conditions on the existing Greater New Orleans Mississippi River (GNO) Bridge.
 
 
 3
 Traffic conditions on the GNO Bridge in recent years have been both dangerous and inconvenient. The design capacity for the GNO Bridge is 60,000 to 65,000 vehicle trips per day (v.p.d.). Capacity was exceeded in the late 1960's while traffic volume has continued to increase until, in 1977, the average v.p.d. was estimated to be 82,000. Single day totals of 95,000 and 100,000 have been recorded. The GNO Bridge currently carries more vehicles per lane each day than any other major bridge in the United States. FEIS, vol. I, p. 2-31. Traffic delays during the week are frequently 25 minutes, 35 minutes during peak hours, and much longer in the event of accidents or breakdowns. Id. The number of accidents on the GNO Bridge ranges from 400-700 per year, and traffic fatalities average four per year. These rates are two to five times higher than national averages for major bridges built to current design and safety standards. Id. at 2-33.
 
 
 4
 In 1974, the Governor's Citizens Advisory Committee recommended that a bridge be built immediately downstream from and parallel to the GNO Bridge; the Governor endorsed the location on August 30, 1974. In June 1975, the Mississippi River Bridge Authority published an Environmental Assessment Report examining four alternatives,[5] and based on its findings, the Authority requested the Coast Guard to issue a permit to build the Downstream Parallel Bridge. The Coast Guard circulated the Report for public comment. On October 22, 1976, the Coast Guard filed a draft environmental impact statement (DEIS); after its circulation, approximately 700 people attended three public hearings on December 15, 1976, March 17, 1977 and April 28, 1977 concerning the bridge project. Over 1,000 written comments were received: 912 letters from agencies, organizations, businesses and individuals supported the bridge project while 107 letters opposed it or required some type of response. The FEIS was filed on August 16, 1978 and was circulated to 210 public and private organizations and individuals. The Coast Guard issued a permit for the Downstream Parallel Bridge on September 28, 1978.
 
 
 5
 Two of the Citizens Groups, CMT and SOWL, filed suit on May 16, 1979 in the district court to enjoin the Coast Guard from proceeding with the project, and CCA brought suit May 1, 1980. These cases were never formally consolidated but were decided together, and after trial, all plaintiffs filed one joint appeal. All defendants moved for summary judgment; on June 5, 1980, the district court held a hearing, and on June 17, the court granted defendants' motions for summary judgment on the basis of the Coast Guard's administrative record, the record in the case, and the FEIS.[6] The next day, the Citizens Groups filed notice of appeal.
 
 
 6
 On appeal, the Citizens Groups maintain that the FEIS is invalid because its analysis is insufficiently detailed[7] in four respects: 1) the project's effects on traffic congestion in the central business district (CBD); 2) the project's effects on local air quality; 3) the energy pricing assumptions and long-range energy consumption associated with the project; and 4) the assessment of alternatives to the project. In addition, the Citizens Groups contend that the combination of alleged misstatements and inadequacies in the FEIS, if not found individually to require reversal of the district court, together present a pattern of bad faith on the part of the Coast Guard sufficient to invalidate the FEIS.
 
 
 7
 The scope of review by a court of the adequacy of an FEIS now seems settled.[8] The Administrative Procedure Act, § 10(e), 5 U.S.C. § 706 (1976) sets forth the proper standards. In this case, the applicable subsections require us to invalidate the Coast Guard's FEIS only if we find that the Coast Guard acted arbitrarily or capriciously, or if the Coast Guard failed to follow the procedure required by law.[9] Under such standards, our task is "to determine whether the (F)EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors," Sierra Club v. Morton, 510 F.2d 813, 819 (5th Cir.1975). However, "once an agency has made a decision subject to NEPA'S procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences," Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam). Moreover, the agency need not "elevate environmental concerns over other appropriate considerations," id.; see Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Accordingly, we should "require full, fair, bona fide compliance with NEPA," Lathan v. Brinegar, 506 F.2d 677 (9th Cir.1974), in order that "agencies will be fully aware of the impact of their decision," id., but in doing so we should not "fly speck" environmental impact statements, id. We should be guided by a rule of reason. Westside Property Owners v. Schlesinger, 597 F.2d 1214, 1217 (9th Cir.1979); County of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1375 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). We should not substitute our judgment for the agency's. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976). After careful review of the issues raised by the Citizens Groups in this case, we find that the Coast Guard's FEIS meets the requirements of NEPA in all of the areas questioned by the Citizens Groups.
 
 
 8
 A. Central Business District Traffic Congestion
 
 1. Earlier Traffic Studies
 
 9
 The chief complaint of the Citizens Groups with respect to the FEIS's discussion of CBD traffic congestion concerns four previous traffic studies.[10] The Citizens Groups maintain that the FEIS did not include sufficient references to the other studies' adverse conclusions about traffic in the CBD.
 
 
 10
 The FEIS does not make specific reference to the 1970 Traffic Operations to Increase Capacity and Safety (TOPICS) Study.[11] However, the Federal Appellees assert, and the Citizens Groups do not contradict the fact, that TOPICS' data from 1969 are outdated; the study does not incorporate new traffic signal technology; and most importantly, the effect of a new bridge was not considered in its analysis. Federal Appellees' Br. at 15; Citizens Groups Reply Br. at 3-4. Significantly, every agency involved in the preparation of the TOPICS Study[12] has since endorsed the concept of a downstream parallel bridge.[13] The Citizens Groups also criticize the Coast Guard's failure to refer in the FEIS to a 1970 New Orleans City Planning Commission Study which rejected a companion bridge to the GNO Bridge. Because of its age, the Planning Commission Study suffers from many of the same infirmities as the 1970 TOPICS Study; moreover, the New Orleans Planning Commission has since specifically endorsed the bridge project, once on May 26, 1977, FEIS, vol. I, p. 1-6, and again on September 6, 1978, Rec. at 53.
 
 
 11
 The FEIS refers to the 1975 Central Business District Community Improvement Plan and Program (CBDCIP) Study, but the Citizens Groups contend the FEIS is inadequate because it fails to make specific reference to the problems discussed in the CBDCIP Study's traffic analysis. The contention lacks substance because the FEIS incorporated within its own traffic discussion the specific recommendations of the CBDCIP Study to accommodate traffic problems through the year 2000. The bridge project includes, for example, parallel surface streets, exclusive truck ramps, peripheral parking, increased mass transit use, and CBD shuttles,[14] all of which were suggested by the CBDCIP Study. The FEIS need not cite all the sources on which it draws for its own analysis.
 
 
 12
 Finally, the Citizens Groups object because the decision of the consultant team which prepared a study for the Governor's Citizens Advisory Committee in 1974 was not included in the FEIS. The consultant team made the Downstream Parallel Bridge its second choice, but the Advisory Committee itself rejected its consultants' first choice, a Press Street Bridge, and recommended the Downstream Parallel Bridge to the Governor. FEIS, vol. I, at 1-5. The FEIS considered the Press Street Bridge alternative elsewhere and likewise rejected it after giving detailed reasons. FEIS, vol. I. pp. 3-65 to 3-106.
 
 
 13
 In light of the foregoing facts, there is no indication that the Coast Guard was either arbitrary or in bad faith when it chose not to refer in detail to these studies.
 
 2. Other Objections
 
 14
 Additionally, the Citizens Groups object to the traffic analysis in the FEIS being confined to a narrow corridor, to the lack of street capacity data in the FEIS, and to an allegedly inadequate description of capacity analyses which were performed. As to the first objection, the district judge's observation is appropriate:
 
 
 15
 The project is not designed to have significant impact upon traffic outside the project corridor. Plaintiffs are doing little more than drawing their own conclusions as to the impact of the new bridge on traffic in non-project areas.
 
 
 16
 Rec. at 697. It seems probable that the FEIS is correct-that such measures as peripheral parking, increased mass transit use, and parallel surface streets will ease the traffic pressure in the CBD. The Coast Guard's opinion on this point is entitled to judicial deference. We may not substitute our judgment for the Coast Guard's, and we certainly must not substitute the Citizens Groups' judgment for the Coast Guard's.
 
 
 17
 As for the objection to capacity data and analysis, the FEIS specifically states that the same computer simulation used in the New Orleans Metropolitan Area Transportation Study (NOMATS) was used for the FEIS, vol. I, p. 2-34. The provisions of NEPA do not require the complete reproduction in the FEIS of information already generally available if the source is adequately cited.
 
 B. Air Quality
 
 18
 The Citizens Groups contend that the FEIS inadequately assessed the project's effects on air quality in three respects: 1) total vehicle emissions; 2) carbon monoxide (CO) levels; and 3) the photochemical oxidant problem.
 
 1. Total Emissions
 
 19
 First, the Citizens Groups object to the manner in which the total vehicle emissions data are presented in the FEIS at Vol. I, Table 2.22; the table breaks the data for the geographical study area into three subareas and into regions within subareas. We find that the FEIS was not inadequate in failing to provide sub-area subtotals for less mathematically inclined readers.
 
 
 20
 Next, the Citizens Groups observe from Table 2.22 that GNO Bridge area pollution levels for hydrocarbons and oxides of nitrogen are greater under the bridge project alternative than under the "No-Build" alternative. Pollution levels for CO are less, however. We need only "insure that the agency has considered the environmental consequences," Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. at 227, 100 S.Ct. at 500 (1980). Table 2.22 itself is evidence that the Coast Guard has done as much. Therefore, we decline to overturn the Coast Guard's judgment that the bridge project is, on balance, the better alternative. See Kleppe v. Sierra Club, 427 U.S. at 410 n.21, 96 S.Ct. at 2730 n.21 (1976).
 
 
 21
 Third, the Citizens Groups criticize the FEIS for confining its total vehicle emissions analysis to the same narrow corridor as that used for the traffic congestion analysis. As with the traffic analysis, they present no evidence to overcome our deference to agency decisionmaking other than their own conclusions.[15]
 
 2. Carbon Monoxide
 
 22
 Carbon monoxide monitoring was inadequate, the Citizens Groups maintain, because of its narrow geographical restrictions, its "spotty" collection, its failure to monitor entire days, its failure to monitor only peak hours, and its age. As this court has recently observed in another context, "the atomistic evaluation urged by the plaintiffs admits of no principled limitation," Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority, 576 F.2d 573 (5th Cir. 1978); we decline to require that the FEIS analysis be done in such minute detail as the Citizens Groups desire.
 
 3. Photochemical Oxidant
 
 23
 The Citizens Groups challenge the FEIS's photochemical oxidant discussion as deliberately misleading because it relied on old data from the New Orleans Health Department and concluded that New Orleans did not have an oxidant problem, when the Environmental Protection Agency had advised the state six months earlier that the area was in violation of the primary oxidant standard. The Federal Appellees maintain that the FEIS was completed in 1977 and sent to the Coast Guard for review before the oxidant violations were known. Federal Appellees' Br. at 30-31. We need not decide the extent of an agency's duty to keep an FEIS and its contents up to the minute. In this case, subsequent correspondence from the Louisiana Air Control Commission and the Environmental Protection Agency to the Coast Guard indicates that they approved of the bridge project because it would help reduce oxidant levels, Rec. at 144-146. The FEIS's discussion of the oxidant problem is not misleading in light of the fact that the project would reduce oxidants whatever their present level.
 
 C. Energy Pricing and Consumption
 
 24
 The Citizens Groups contend that the FEIS overestimates GNO Bridge use and the need for a new bridge because projections were based on an assumed gasoline price of 54.5 cents per gallon.[16] Obviously, 54.5 cents per gallon is not the current price for gasoline today, but many other factors will influence bridge use, FEIS, vol. I, p. 2-38. Despite the rising price of gasoline, use of the GNO Bridge has increased at an average rate of approximately 2.1% since the energy crisis of 1973-74, with higher increases in the more recent years, id. at Table 2.13. The FEIS estimate of 2% increase in bridge corridor traffic each year is not rendered invalid because of the underestimation of one element in the calculus.[17]
 
 
 25
 Additionally, the Citizens Groups criticize the discussion of long-term energy consequences in the FEIS for its lack of detail. On the contrary, we find that the long-term energy consumption discussion was adequate. Relevant information located throughout the FEIS and in the DEIS need not have been restated at length in a separate section; a summary paragraph, FEIS, vol. I, p. 2-89, was sufficient.
 
 D. Alternatives
 
 26
 Finally, the Citizens Groups object to the FEIS's discussion of alternatives. Specifically, they contend that the "No-Build Alternative," FEIS, vol. I, pp. 3-28 to 3-45, and alternate 8 (another no-build alternative), id. at 3-57 to 3-63, failed to combine strategies to reduce traffic such as widening existing bridges and reimposing tolls. We find that the FEIS's treatment of alternatives was more than adequate. Numerous strategies were combined in each alternative. Reimposition of tolls, specifically, was discussed earlier in the FEIS and dismissed as follows:
 
 
 27
 Bridge traffic usage under toll conditions is expected to be slightly lower than under toll-free conditions; however, a demonstrated high traffic demand, a high percentage of work and business trips in the traffic flow, and an absence of good alternative routes will tend to minimize the differential.
 
 
 28
 FEIS, vol. I, p. 2-49. It was unnecessary for the FEIS to repeat this in each of its discussions of alternatives. Some reasonable limit to discussion of alternatives must be set, Westside Property Owners v. Schlesinger, 597 F.2d at 1217; County of Suffolk v. Secretary of Interior, 562 F.2d at 1374, and in our opinion the Coast Guard's FEIS surpassed any such limit.
 
 
 29
 In conclusion, we hold that the FEIS prepared by the Coast Guard discusses each of the environmental concerns raised by the Citizens Groups and that the FEIS was not inadequate or prepared in bad faith. To the contrary, the Coast Guard has made a careful and detailed study of the Downstream Parallel Bridge's environmental impacts. We agree, therefore, with the findings of the district court that the actions of the Coast Guard conformed to the procedure required by law, and that the agency's decision was not made in an arbitrary or capricious manner. Failure to relieve the intolerable conditions faced by the cross river traffic has cost the New Orleans area severely in human life, limb, inconvenience, anxiety, and delay. The Downstream Parallel Bridge project must now proceed to completion as expeditiously as possible. The judgment of the district court is accordingly
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 42 U.S.C. §§ 4321-4347 (1976)
 
 
 [2]
 Defendants in the district court were individuals acting in their official capacities as Secretary of Transportation, Commandant of the United States Coast Guard, Secretary of the Louisiana Department of Transportation and Development, and Governor of Louisiana. For convenience, all defendants will be encompassed within the term "the Coast Guard" when the context so requires; otherwise, they will be referred to as "Federal Appellees" and "State Appellees."
 
 
 [3]
 "The agency's decision must still be set aside if it is 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) ...." Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 229, 100 S.Ct. 497, 501, 62 L.Ed.2d 433 (1980) (Marshall, J., dissenting). See id. at 228 n.2, 100 S.Ct. at 500 n.2 (per curiam); Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 549-50, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978); Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (1976)
 
 
 [4]
 Counsel for State Appellees said at oral argument that the provisions of 23 U.S.C. § 134 (amended 1978), passed in 1962, and the Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601-13 (amended 1978), provided the impetus to study transit problems across the Mississippi River
 
 
 [5]
 The alternatives were a Downstream Parallel Bridge, a Press Street Bridge, a modification of the GNO Bridge, and a No-Build Alternate. FEIS, vol. I, p. 1-5
 
 
 [6]
 The district judge stated in his opinion:
 It was generally understood that the June 5, 1980 hearing would be limited to the administrative record and any affidavits (and/or depositions) filed into the record before that date. All counsel agreed this procedure would be followed, reserving the right to file a responsive memo or affidavit to any affidavits filed very close to the June 5, 1980 hearing date.
 Rec. at 695.
 
 
 [7]
 NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C), requires that FEIS be
 a detailed statement by the responsible official on-
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 [8]
 Compare Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures, 422 U.S. 289, 326-27 n.28, 95 S.Ct. 2336, 2359 n.28, 45 L.Ed.2d 191 (1975) and Sierra Club v. Adams, 578 F.2d 389, 393 (D.C.Cir. 1978) (proper scope of review still an open question) with note 3 supra (arbitrary and capricious standard)
 
 
 [9]
 The Administrative Procedure Act, § 10(e), 5 U.S.C. § 706 (1976) provides:
 The reviewing court shall-
 (2) hold unlawful and set aside agency findings, and conclusions found to be-
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (D) without observance of procedure required by law ....
 
 
 [10]
 The four studies were the Traffic Operations Program to Increase Capacity and Safety Study, the New Orleans City Planning Commission Study, the Central Business District Community Improvement Plan and Program Study, and the Governor's Citizens Advisory Committee's Consultant Team Study, Citizens Groups Br. at 15, 17, 18 & 19
 
 
 [11]
 TOPICS found that 33 of 57 CBD intersections studied were operating at the "greatest volume the intersection can accommodate," Rec. at 442, 445, and 16 of 57 were operating at a level where drivers "usually must wait more than one cycle, but no excessive backups occur," id. The FEIS found:
 Capacity analyses of all major street intersections on the uptown side of the CBD indicate that all intersections are capable of handling the projected traffic volumes. All intersections are now operating below capacity and with sufficient reserve to handle project induced traffic growth.
 FEIS, vol. I, p. 2-47.
 
 
 [12]
 The agencies were the United States Department of Transportation, the Federal Highway Administration, the Louisiana Department of Highways, and the governing bodies of Jefferson, Orleans and St. Bernard Parishes. Rec. at 78, Ques. 9; 136, Ans. 9
 
 
 [13]
 See Rec. at 68-69 (U.S. Department of Transportation and Federal Highway Administration); Rec. at 44-51 (Louisiana Department of Transportation and Development); Rec. at 55-57 (New Orleans City Council); Rec. at 58 (Jefferson Parish Council); Rec. at 66 (St. Bernard Parish Police Jury)
 
 
 [14]
 FEIS, vol. I, pp. 2-43 to 2-49
 
 
 [15]
 The Citizens Groups maintain that a statement made by their expert during his deposition offers additional support for their conclusions. However, the expert's statement was based on a hypothetical question which assumed conditions which the Citizens Groups now seek to prove. See Rec. at 649 (p. 77)
 
 
 [16]
 The inconsistency of arguing both that CBD intersections will be choked by the increased traffic projected in the FEIS and that the increased price of gasoline will curb bridge use is apparent. We assume that the Citizens Groups make these arguments in the alternative
 
 
 [17]
 In any event, we are inclined to agree with the Federal Appellees that exact estimation of the projected growth rate in bridge use is not essential to the FEIS's discussion of the need for a new bridge, Federal Appellees' Br. at 34. The existing GNO Bridge is seriously overcrowded now. See p. 991 supra